Bulkley Dunton & Co., Incorporated v. Commissioner.
Bulkley Dunton & Co. v. Commissioner
Docket No. 78284.
United States Tax Court
T.C. Memo 1961-133; 1961 Tax Ct. Memo LEXIS 216; 20 T.C.M. (CCH) 660; T.C.M. (RIA) 61133; May 15, 1961
Mason G. Kassel, Esq., and John A. Gray, Esq., for the petitioner. Howard B. Sweig, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in income tax for the taxable year ended March 31, 1955 in the amount of $16,348.12. The only question for decision is whether the Commissioner properly disallowed a claimed interest deduction in the amount of $30,000. Findings of Fact Some of the facts are stipulated, are so found and the stipulation together with the pertinent exhibits are included herein by reference. The petitioner, which was originally named Bulkley Dunton Corporation, was organized under the laws of the State of New York on December 27, 1941. It remained inactive and engaged in no business activities until January 2, 1946. Its *217 name was changed to its present name on January 29, 1946. Petitioner keeps its books and files its returns on an accrual basis for fiscal years ended March 31. For the fiscal year ended March 31, 1955, petitioner filed its corporation income tax return with the district director of internal revenue, Upper Manhattan, New York, New York. Bulkley Dunton & Co. was a partnership which was originally organized in 1833. It was continuously engaged in the paper business from its organization until December 31, 1945. The petitioner is the corporate successor to the business of the partnership of Bulkley Dunton & Co. The paper business conducted by the partnership and later by petitioner consisted of paper brokerage or agency (selling paper as agent for mills to large industrial consumers) and paper merchandising (sales of paper in more limited quantities than is true in the case of any agency business, out of inventories maintained by the merchandiser). During the calendar year 1945, and for a number of years prior thereto, the partnership of Bulkley Dunton & Co. was composed of four individuals, J. O. Bulkley, W. H. Cowles, G. G. Cobean and J. C. Marvin. The following table sets *218 forth the investment of each in the capital of the partnership at December 31, 1945, and their respective participation in the profits of the partnership: Capital Account
Profit Par-
Per-
ticipation
cent-
Percent-
Partners
Amount
age
age
J. O. Bulkley
$697,174.39
80.24
65
W. H. Cowles
97,034.18
11.17
20
G. G. Cobean
54,676.05
6.29
10
J. C. Marvin
20,000.00
2.30
5
$868,884.62
100.00
100
At the end of 1945, G. G. Cobean decided to withdraw from the partnership of Bulkley Dunton & Co. and to receive in cash his interest in the partnership's capital. Bulkley, Cowles and Marvin thereupon determined to dissolve the partnership and to continue the business formerly carried on by the partnership through the petitioner. On the dissolution of the partnership of Bulkley Dunton & Co., which occurred on December 31, 1945, Cobean withdrew his entire capital account of $54,676.05, leaving the partnership with net assets of $814,208.57. Bulkley, Cowles and Marvin received a portion of their respective capital accounts in cash upon liquidation of the partnership and as set forth below, transferred the partnership's business and assets *219 to the petitioner. The following table sets forth the disposition of the capital accounts of Bulkley, Cowles and Marvin: J. O. Bulkley
W. Cowles
J. C. Marvin
Value of capital account in partnership on
December 31, 1945
$697,174.39
$97,034.18
$20,000.00
Value of assets transferred to petitioner
570,700.00
20,200.00
10,100.00
Received in cash on liquidation of partnership
126,474.39
76,834.18
9,900.00
Net assets of $601,000 were transferred by the partners to the petitioner. In the business judgment of the partner-shareholders the petitioner would not need more than this amount to continue to engage in business. Bulkley, Cowles and Marvin wished to carry on the business theretofore conducted by the partnership in corporate form in order to give continuity to the operations of the business, and to avoid the problems involved in redrawing partnership agreements every time a partner joined or withdrew from the firm. They also wished to limit their liability and to avoid the imposition of taxes at the high surtax rates applicable to individuals doing business in partnership form. On January 2, 1946, Bulkley, Cowles and Marvin, who had acquired *220 as of the close of business of December 31, 1945 the joint ownership of the partnership's business properties and assets subject to liabilities, transferred such properties and assets subject to liabilities to the petitioner in consideration of the issuance and delivery by the petitioner to the said transferors of a 6 percent registered note and common and preferred stock as follows: 6% NON-VOTING
COMMON SHARES
PREFERRED STOCK
(Par Value $1
Par Value $100
6% Non-Voting
per share)
per share)
Registered
Name
Number
Value
Number
Value
Note
J. O. Bulkley
700 $700
700
$70,000
$500,000
W. Cowles
200 $200
200
$20,000
J. C. Marvin
100 $100
100
$10,000
The reason that J. O. Bulkley took back a $500,000 note upon the transfer of the partnership assets to the petitioner was that, since Cowles and Marvin were unable to contribute more than $30,000 to the capital of the petitioner, Bulkley did not want to make a contribution to the capital of the corporation disproportionate to his interest in the profits. This had been the situation in the case of the partnership, and the relative contributions to *221 the equity capital of the petitioner were designed to correct this situation. Bulkley was not related to Cowles or Marvin by blood or marriage. During the fiscal year ended March 31, 1949, friction developed between Wendell H. Cowles, on the one hand, and J. C. Marvin, on the other. As a consequence, Cowles decided to withdraw from the corporation and made an offer to sell to the petitioner all of his stock, including both preferred and common, at book value. This offer was accepted. The book value of Cowles' stock at this time was $278,049.77. Petitioner's balance sheet at March 31, 1949 showed earned surplus in the amount of $757,913.50. The $500,000 registered note issued by petitioner to J. O. Bulkley bore interest at 6 percent, was due March 31, 1956, and unconditionally obligated petitioner to pay the face amount at maturity. It also provided, beginning with the fiscal year ended March 31, 1949, that if in any year, the net earnings of the petitioner, as defined in the note, were in excess of $50,000, the petitioner was required to apply its earnings to the redemption of $50,000 of principal and payment of all accrued and unpaid interest. In the event of default by the *222 petitioner or if the petitioner were adjudicated a bankrupt, or if similar other conditions set forth in the note were violated, upon demand in writing of the holder of the note, the entire principal amount thereof became due and payable. The note was transferable by the registered holder on the books of the petitioner; it was not by its own terms subordinated to the claims of any creditors of the petitioner. Beginning with the calendar year 1946 and through the taxable year under review, Bulkley has always reported the payments of interest on the 6 percent $500,000 registered note as interest income on his income tax returns. During these years, Bulkley's maximum surtax bracket has always been at least 80 percent and has frequently been higher. Interest has been regularly accrued and paid by petitioner on the $500,000 registered note, and its books of account, auditor's reports, and financial statements have always shown such note as a note payable. During petitioner's taxable year ended March 31, 1955, petitioner accrued and paid the amount of $30,000 as interest on the $500,000 indebtedness owing to J. O. Bulkley. The $30,000 was paid by petitioner to J. O. Buckley in the *223 amount of $15,000 on October 19, 1954 and in the amount of $15,000 on March 29, 1955. In 1947, petitioner sought to acquire the stock of a competitor, Carter Rice & Company Corporation, a Massachusetts corporation, which was engaged in the business of selling paper throughout the New England area. In order to effect this purpose, it caused a newly-organized subsidiary, B. D. Massachusetts Corporation, to which it had made an initial contribution to capital of $128,713.92, to obtain a loan in the amount of $650,000 from the New York Trust Company on November 27, 1946. In order for this loan to be obtained, it was necessary for petitioner fully to guarantee the repayment thereof. On March 31, 1947, B. D. Massachusetts Corporation acquired the stock of Carter Rice & Company Corporation for $774,126.63. Effective March 31, 1947, Carter Rice & Company Corporation merged into B. D. Massachusetts Corporation and the name of the resulting corporation was changed to Carter Rice & Company Corporation. Thereafter, on May 14, 1947, $150,000 was repaid on the outstanding loan to the New York Trust Company. On June 27, 1947, the loan, the balance of which was then $500,000, was refinanced with *224 the New York Trust Company and Brown Brothers Harriman. Each loaned Carter Rice $250,000. Thereafter, the loan was repaid in installments of $50,000 per year to each of the obligees. The final installments on the loans were repaid on November 1, 1951. In connection with the refinancing which occurred on June 27, 1947, since petitioner was a guarantor on the loans to Carter Rice, the banks required Bulkley to subordinate repayment of the $500,000 registered note owed by petitioner to him personally to the repayment of the loans by Carter Rice to New York Trust Company and Brown Brothers Harriman. Petitioner's balance sheet at March 31, 1947, disclosed cash on hand of $793,050.46 and accounts receivable (less reserve for bad debts) in the net amount of $1,985,904.21, and during the entire calendar year 1947, there were no bank loans to the petitioner outstanding. Petitioner did not require additional working capital at the time Bulkley signed the subordination agreement, and his purpose in entering into this agreement was not to make such additional working capital available to petitioner, but to permit petitioner's subsidiary to obtain the funds to acquire the stock of a competitor. *225 The loans from New York Trust Company and Brown Brothers Harriman to Carter Rice were repaid in full on November 1, 1951, and at that time, the agreement subordinating the repayment of the $500,000 registered note to the repayment of these loans to the banks was released. Effective March 31, 1953, Carter Rice & Co. acquired 100 percent of the stock of another competitor, Storrs & Bement Co., a Massachusetts corporation engaged in the business of selling paper in the New England area. It paid a total consideration of $1,232,221.39 therefor. Of this amount, $940,000 was acquired by way of a loan, guaranteed by petitioner, from the First National Bank of Boston, and $292,221.39 was paid out of cash on hand. The $940,000 loan from the First National Bank of Boston was dated February 13, 1953. The note was repayable in 1 year. However, if by that time Carter Rice had reduced the balance outstanding to $750,000, it was privileged to refund the loan by taking a new note payable in 10 semi-annual installments. Carter Rice availed itself of this option. It had the privilege of making prepayments on the note and availed itself thereof with the result that the note was paid off on June 25, 1957. *226 Repayment of the $500,000 registered note held by Bulkley was subordinated, at the insistence of the bank, to the repayment of the loan by the First National Bank of Boston to Carter Rice pursuant to a subordination agreement signed by Bulkley dated February 13, 1953. From November 1, 1951, until February 13, 1953, negotiations were in progress for the acquisition of Storrs & Bement Co. It was anticipated, in the event of a purchase, that substantial bank loans would have to be negotiated by Carter Rice to finance the acquisition. Bulkley did not, during this period, insist on repayment of the then due installments of principal on the $500,000 registered note because he wished to maintain the credit position of the parent company, in order to facilitate the obtaining of the necessary bank loan. On February 13, 1953, petitioner did not have any loans outstanding with commercial banks. Petitioner had cash on hand at the close of its fiscal year ended March 31, 1953 in the amount of $529,719.71 and it had accounts and notes receivable in the total gross amount of $2,272,961.91, less reserve for bad debts of $154,740.60, or a net of $2,118,221.31. Petitioner had adequate working *227 capital at February 13, 1953, and the subordination agreement of that date was not negotiated in order to make additional working capital available to petitioner. The subordination agreement was entered into to permit petitioner's subsidiary to acquire the stock of a competitor. The acquisition of the stock of Carter Rice & Company Corporation and of Storrs & Bement Co. was not contemplated at the time petitioner acquired the assets of the partnership, on January 2, 1946. The $940,000 loan from the First National Bank of Boston was repaid in full on June 25, 1957, at which time the subordination agreement of February 13, 1953 was released. Since June 25, 1957, the petitioner, at Bulkley's request, has not made repayments of principal on the $500,000 registered note because the Internal Revenue Service had, prior to that time, raised the issue now in litigation, and Bulkley feared that if repayment were made to him, the proceeds might be taxed as a dividend. Repayment of the note was extended, pursuant to mutual consent, to March 31, 1957 and March 31, 1960 by duly adopted corporate resolutions dated July 23, 1956 and July 11, 1957, respectively. Petitioner is ready to pay the *228 note in full as soon as this litigation is terminated. The petitioner did not have to borrow any money for the first 27 months of its existence. Thereafter, it has borrowed for short periods of time. The partnership transferred to petitioner a number of intangible assets, among the most valuable of which was the use of the name "Bulkley Dunton." The name has been connected with the paper business since 1833 and its reputation in the trade has always been very high. The partnership also transferred to the petitioner a going business, including customer, suppliers and a trained staff of approximately 200 employees, of which roughly one-third were experienced salesmen. Prior to December 31, 1945, the partnership, as agent had an interest in long-term contracts with Cowles Magazines, Fawcett Publications, and Popular Publications, all of which on December 31, 1945 had a substantial period to run prior to expiration date. On January 2, 1946, they were all transferred to petitioner and under such contracts petitioner earned commissions of $889,499.11. Immediately prior to January 2, 1946, the partnership had an interest in long-term contracts for the sale of paper to numerous customers *229 other than those set forth above. Substantial amounts of income were earned by petitioner after the transfer to it on January 2, 1946 of the contracts referred to in this paragraph. The partnership also dealt with many customers, who were not under contract, but with whom the petitioner continued to do business after it took over the assets of the partnership. Immediately after the end of World War II and continuing for a period somewhat in excess of 2 years, paper was in short supply. Petitioner's and its predecessor partnership's long-established relationships with its suppliers permitted it to obtain paper during this period of war-induced scarcity. The net profits of the partnership for the 5 calendar years preceding the acquisition of its assets by the petitioner, as shown by the partnership's income tax returns and as adjusted upon audit, were as follows: Per Revenue
Agent's Re-
Per Return
ports
1941
$140,000.38
$141,182.33
1942
$142,151.24
No adjustment
1943
$272,302.02
$275,649.76
1944
$428,112.83 *
No adjustment
1945
$476,108.36
$474,182.33
The net tangible assets of the partnership at the indicated balance *230 sheet dates were as follows: December 31
1943
$584,873.52
1944
847,595.84
1945
868,884.62
The net profits of the petitioner before and after taxes (as adjusted per various revenue agents' reports) from the date of its organization through the end of the fiscal year ended March 31, 1954 were as follows: (1)
(2)
(3)
Fiscal Year
Earnings Before
Tax on
Earnings After
Ended 3/31
Taxes
Column (1)
Taxes
1946 *
$194,239.98
$ 73,811.20
$120,428.78
1947
898,891.50
341,578.77
557,312.73
1948
607,540.37
230,865.33
376,675.04
1949
207,659.86
78,910.75
128,749.11
1950
237,205.54
90,138.11
147,067.43
1951
878,334.71
461,654.99
416,679.72
1952
594,266.49
327,226.98
267,039.51
1953
339,475.05
170,266.86
169,208.19
1954
380,570.49
192,365.45
188,145.04
The petitioner did not pay any salary to Bulkley who was its president during the period March 31, 1946 through March 31, 1954. The petitioner did not pay any dividends on its common stock from the date of its organization to March 31, 1957. It paid dividends on its preferred stock which was redeemed for cash during the fiscal year ended *231 March 31, 1952. The Commissioner treated the redemption as substantially equivalent to a dividend and the affected stockholders have paid the resulting deficiencies. The petitioner claimed the $30,000 payments made to Bulkley in fiscal 1955 as interest deductions and the Commissioner determined that amount not to be "deductible within the meaning of Section 163 or any section of the Internal Revenue Code of 1954." Ultimate Findings The $500,000 note represented a true indebtedness and the $30,000 paid by petitioner in fiscal 1955 constituted interest on indebtedness. Opinion The question of whether payments made on so-called debentures or notes or other forms of indebtedness are deductible as interest has been dealt with by the courts on so many occasions that there is a plethora of cases that would lend themselves to citation. It is sufficient for present purposes to cite but one, , affd. (C.A. 6), certiorari denied , which teaches that in deciding cases of this kind the courts have been careful not to lay down any all-embracing rule, but have been content to rely on a certain *232 criteria "none of which is, by itself, determinative of the ultimate fact question." The ultimate conclusion is to be drawn after a consideration of all the facts and our ultimate finding has decided this case in petitioner's favor. We think the various factors in this case show that the $500,000 registered note represented a true indebtedness. Accordingly the payments made to Bulkley which are here in issue are properly deductible as interest. The Commissioner's main contentions are that the petitioner's corporate structure was "artificial", that the only purpose for the issuance of the note was "tax avoidance", and that the execution of the subordination agreements coupled with Bulkley's failure to take steps to enforce repayment of the obligation indicates that the parties never intended to create "a debt payable in any event." Despite the Commissioner's argument, we are unable to find any element of tax avoidance in this case. Although Bulkley was the controlling stockholder of petitioner, there were other unrelated stockholders who were affected, and so far as we can ascertain, the issuance of the note was the result of an arm's length transaction. Further, giving consideration *233 to the fact that intangible as well as tangible assets were involved in the transfer made to the petitioner by the partners, it is our opinion that the corporate structure was not at all artificial, and the question of "thin capitalization", relied on by the Commissioner has little weight in this case. See . Furthermore, Bulkley drew no salary as an officer of petitioner, and, had tax avoidance been important from the petitioner's standpoint, deductible salary could have been paid. Bulkley's forbearance in enforcing payment of the indebtedness is adequately explained by the need for bank loans to finance, not the ordinary business operations of the petitioner, but the expansion program on which it embarked. See (C.A. 9, 1952) where it was said failure to attempt to collect a debt does not per se destroy its character as such; * * * and the same strict insistence upon payment on the due date as would be the case if a bank were the creditor should not be expected where a shareholder, or one who is closely identified therewith, is a creditor. On the whole, we think the factors tending *234 to show a true indebtedness outweigh those which tend to a contrary conclusion and we hold that the petitioner is properly entitled to its claimed interest deduction. Decision will be entered under Rule 50. Footnotes
*. amended↩
*. 3 months.↩